C. H. PALMER, Appellant, v. NORTHWESTERN NATIONAL IN-SURANCE COMPANY et al., Appellees (and six other cases).

JUDGMENT:    Adjudication—Identity of Issues.    An adjudication 1    that plaintiff had no title under certain deeds, because of their fraudulent nature, may not be avoided in a subsequent action between the same parties by resting claim to title on subse-quent deeds admittedly given in lieu of such former deeds, and for the same purpose.

PARTNERSHIP:    Firm Property—Evidence.    Evidence reviewed, 2    in an action to determine the interests of the parties in the proceeds of certain fire insurance on property claimed to have belonged to a partnership, and held to show that said property belonged to the partnership.

*Appeal from Lucas District Court.*—D. M. ANDERSON, Judge.

OCTOBER 2, 1919.

ACTION in equity to determine the rights and interests of the parties in the proceeds of certain fire insurance,

which was paid into court by the insurance companies; also, to determine the rights of the parties in certain real estate. Plaintiff claimed to be the owner of the real estate and of the insured property. The trial court found that plaintiff was not entitled to the full relief asked by him, and granted him partial relief, and honored a written contract for one half the store, and also his right to share by inheritance in his mother's half of the property. He appeals.—*Affirmed.*

*C. W. Stuart, J. A. Penick,* and *James A. Howe,* for appellant.

*W. W. Bulman, E. A. Anderson, Hickman & Wells,* and *W. Collinson,* for appellees.

PRESTON, J.—The issues were somewhat complicated at first, but several questions were eliminated by dismissal of certain claims at the conclusion of all the evidence; though much of the evidence in the voluminous record is in regard to the issues now out of the case. Appellant states that the issues remaining are two fact questions: First, as to who owned the real estate, and what should be done with it; and second, who owned the mercantile business, and is entitled to the proceeds of the insurance.

The claims of the parties, as stated by appellant, are that plaintiff owned both the real estate and personal property, and was entitled thereto; that Anna L. Peck claimed that she was entitled to an undivided one third of both the real estate and personal property; that Grace West claimed that plaintiff owned an undivided one half of the mercantile business and an undivided one half of the real estate, and that the other one half belongs, share and share alike, to plaintiff, C. H. Palmer, Anna L. Peck, and herself; that C. E. Stuart, administrator, claimed that, as such, he was entitled to the real estate and the proceeds of the insurance. There is a further claim by appellees that the finding of the jury in the trial of the first insurance case, wherein the

judgment was against this plaintiff, is an adjudication against him herein, and there is the further claim by appellant that the decree is inconsistent in this: that, the court having found that appellant was entitled to an undivided one half of the real estate and personal property, the decree provides that he shall pay for the real estate from the proceeds of the insurance. The plaintiff, Palmer, and the defendants Peck and West are brother and sisters, and the children of Ann Palmer and T. E. Palmer. The parents died in 1914. The death of the husband, Thomas, preceded that of his wife, Ann, a few hours. Defendant Stuart is the administrator of the estate of Ann Palmer, deceased. Prior to 1891, when the parties returned to Chariton, Iowa, the business was small, with a small amount of capital. It was growing, and, on March 14, 1891, plaintiff and his mother, Ann Palmer, entered into a written contract as follows:

"A contract between A. Palmer and C. H. Palmer for partnership in the business under the name of A. Palmer, T. E. Palmer, A. Palmer, and C. H. Palmer to constitute a family, whose expenses, such as clothing, fuel, rent, labor of servants, provisions, medicine, doctor's fees,—in fact, all ordinary expense of the family; also, all expense of store, such as rent, fuel, clerk hire, taxes, etc., are to be paid out of the profits of said store, and all profits over and above said expenses are to be equally divided between said A. Palmer and C. H. Palmer. T. E. Palmer, agent for A. Palmer, and C. H. Palmer are to have control of said business, and C. H. Palmer is to devote all his time to the interest of said business.

"Signed this 14th day of March, 1891.

> "Ann Palmer,
> "C. H. Palmer."

The father was a tinner by trade, and continued to work in that branch of the business as long as his health

would permit, after the making of the contract, and one of the daughters clerked in the store. At the time of the making of this contract, the capital invested in the business was about $3,000, with about $1,500 indebtedness against it. The trial court found the value of all the real estate to be $5,500. This, added to the $13,200.12 of insurance, made a total estate of $18,700.12. In 1916, the whole stock of goods, which had grown to be, and was called, a department store, was destroyed by fire. It was insured in different companies for various amounts, aggregating the amount before stated. It is claimed by appellees that this represented all of the net earnings of the store, except that, prior to the fire, out of the net earnings, a home was bought and paid for, and a rental property acquired with the store money; but appellant claims that the real estate, or a part of it, was bought by him with his own money. At the time of the death of the parents, the record title to the home was in Ann Palmer. The record title to the rental property still stood in the name of one Powell, from whom it had been purchased, and the store was without any transfer of record from Ann Palmer. Plaintiff claimed that, after the execution of the partnership contract, he became the owner of the store by a bill of sale and deed executed in 1906, and, these being lost, and, as appellant claims, not found until after the fire, in 1916, others were executed, in 1911, to take their place; and these had not been recorded, at the time of the death of the parents, as we understand the record. Soon after the fire, the loss was adjusted, and plaintiff was proceeding to collect the money from the several insurance companies. The sisters served notice on the insurance companies that they claimed an interest in the insurance money, and the administrator notified the companies, and claimed the money for his intestate. The administrator brought an action in equity against appellant for an accounting of the

affairs between C. H. and Ann Palmer. Then appellant brought an action at law on the policies against each insurance company, in which cases the administrator intervened, claiming the money on the ground that the store belonged to Ann Palmer, and that the amounts due on the policies were a part of her estate. The insurance companies deposited with the clerk of court the money, or drafts, and withdrew from the cases, leaving the administrator and C. H. Palmer contending for the possession thereof. In each case against the insurance companies, appellant alleged that the store was his property, when destroyed; that it had been the property of Ann Palmer; and that, on July 2, 1906, she had made a bill of sale of it to him. This was denied by the administrator. About this time, a bill of sale, dated July 2, 1906, was recorded. purporting to be from Ann Palmer, in which appellant's name appeared as grantee; also, a deed for the home property, of the same date, with appellant's name as grantee. This deed also contained a grant of all the personal property. The first case tried was *Palmer v. Milwaukee Mech. Ins. Co.*, in which the administrator was intervener. The issue was, Who owned the store and stock of goods when it burned, and who was entitled to the $3,045.48 of insurance money on the two policies in that company? Appellant claimed under the two recorded instruments before referred to, and the administrator answered that the instruments were not appellant's; were not intended for him, nor to pass title to him, but for another purpose; that they were never delivered in the lifetime of the grantor; that possession thereof was procured by fraud; that they had been changed, and were null and void; that the name C. H. Palmer, as grantee, was placed there by him, without authority, or by him procured to be done, after the death of the parents. The jury found for the administrator, and that he was entitled to the money. Judgment was entered

on the verdict against appellant. There has been no appeal from said judgment, and the time has now expired. Thereafter, the cases were all consolidated, and tried as in equity. This is the case now before us. The issues were the same in the instant case as in the first insurance case, except that the administrator pleaded prior adjudication as to the ownership of the store and the invalidity of the title, the deeds, and bill of sale, and except that appellant, by amending, declared upon the 1911 deed and bill of sale. As against this, the administrator pleaded that the title had already been determined; also, that the 1911 instruments were obtained when Ann Palmer was not competent to make them, and were obtained by fraud, duress, compulsion, and undue influence. By its decree, the trial court found that the partnership contract between appellant and his mother was valid, but that the other instruments, under which appellant claims, were invalid. The trial court divided the property in controversy equally between C. H. Palmer and the estate of Ann Palmer, and found that, the real estate being now in the name of C. H. Palmer, the title would be confirmed in him, and he would be charged with the value thereof, to wit, $5,500; that the administrator would be charged with $3,045.48, the amount already paid him in the first insurance case; that the clerk of court would then pay the administrator, out of funds in the clerk's hands, a sum which, added to the amount already received by him, would make the amount received by him $5,500, which would equal the amount charged to appellant; that, of the balance remaining in his hands, the clerk should pay one half to appellant and the other half to the administrator; that, upon the settlement of the Ann Palmer estate, appellant should receive his one-third share thereof, and defendants Peck and West each one third thereof. It may be well at this point to take up briefly the two questions as to the alleged adjudication and

the alleged mistake in the decree, before proceeding to the real merits of the case, as to who owned and is entitled to the property.

1. We shall spend but little time on the question of adjudication. The real controversy in the first case was as to who owned the business; and the instruments by which appellant claimed the business were so connected and related to the ownership of the real estate that the title and owner-ship of the real estate were more or less involved. The parties were the same, and the issues were substantially the same, except that, as before stated, in the instant case appellant also claimed under the new bill of sale and deeds of 1911. But the evidence shows that these were given in renewal of the 1906 instruments, and were given for the same purpose. This did not change the issue as to the ownership of the property. Under the decision of the first case, the jury necessarily found, under the issues, that the 1906 deed and bill of sale were void; that they had been altered and changed; that, after the death of the parents, appellant had, without authority, written his own name in them as grantee, or procured it to be done; that they were not delivered in the lifetime of Ann Palmer; that their possession was procured by him fraudulently; and that they were not executed for nor intended to pass title to appellant, but for another purpose. It is contended by appellees, and there is evidence to support the claim, that these instruments were at first in blank, and that the name of one of the daughters was to be inserted, so that, should Ann Palmer die before her husband, the property would go to the three children; that, in some way, appel-lant obtained possession thereof, and inserted his own name as grantee, after the death of the parents. It may be that one of the purposes of such instruments was that the prop-erty should go to the children; but it appears that T. E.

1. **Judgment**: adjudication: identity of is-sues.

Palmer, the husband of Ann Palmer, had been unfortunate in his business, some years before, and it is quite clear from the record that one purpose was to keep this property from his creditors, under certain contingencies, as he supposed. Appellant was also concerned in some of the ventures of the father which resulted in loss, but a $6,000 judgment against him, growing out of this or another matter was canceled by his mother, as we understand it. If the other parties had appealed, a different question might be presented as to the adjudication. Strictly speaking, it may not be an adjudication; and yet, under all the circumstances, it is closely akin to it, and has substantially the same effect. It may be that appellant is at some disadvantage now from not having appealed from the first judgment against him. The trial court seemed to be of opinion that the equities, to a certain extent, were with appellant, in that the conduct of the business and the affairs of the parties were in the nature of a family arrangement. We are satisfied from the entire record that appellant received all he was justly entitled to. Aside from the question of the alleged adjudication, we are convinced, from the evidence introduced on this trial, that the finding of the trial court as to the ownership of the property should be sustained.

2. The matter as to the alleged mistake seems not to have been presented to the district court. We think there is no inharmony or inconsistency in the decree. It is claimed by appellant, as we understand it, that he should receive, altogether, $12,466.74. It is claimed by appellees that the record shows that appellant has received from the clerk, under the decree, a certificate of deposit for $1,015.16, and another for $2,834.90, and that these two, with the $5,500 worth of real estate given appellant, make a total of $9,350.06 for him, and that the clerk has turned over to the administrator $9,350.06, which represents the other

half, and that the two added together make the whole estate $18,700.12. In addition to this, appellant is to receive from the administrator, on distribution, one third of $9,350.06, or $3,116.69, making for appellant $12,466.75, or within one cent of what appellant claims. It may be that some of these figures are not strictly within the record; but, in the reply brief, appellant seems to concede all that appellees say about it. Aside from this, an analysis of the decree will work it out in the same way. We shall not stop to make this analysis now, because, in the reply argument, appellant seems not now to seriously question the correctness of the decree, but they say:

"As a matter of fact, there is, therefore, a difference of only one cent in the amount claimed by appellant and the amount conceded by the appellees, the appellees conceding, in their arguments, one cent more than the appellant claims."

3. Manifestly, we ought not to go into the details of the evidence on the merits. The record has been read, and we shall content ourselves with giving some of the circumstances shown by the evidence which are entirely inconsistent with and contradictory of appellant's claim under the bill of sale and deed and the renewals thereof. It is true that there is evidence on behalf of appellant, including his own testimony and that of his attorney and other witnesses, tending to support his claim; but appellant's case depends, to a considerable extent, on his own testimony and that of his attorney. The testimony of appellant himself is challenged as being incompetent under the statute as to personal transactions and communications between himself and his mother. Appellant says that, after the claimed execution of the instruments of 1906, he claimed to own all the property; but there appears to have been no outward change, and the parties continued to live as a

2. PARTNERSHIP: firm property: evidence.

family in the homestead property, as before. There are several circumstances inconsistent with appellant's claim, which will be referred to later. We think the evidence shows that the real estate properties were made out of the business. It is not quite clear from the evidence just how the blank bill of sale and deeds were changed and C. H. Palmer's name inserted as grantee, but that it was done, is shown substantially. On July 3, 1906, the next day after the date of the bill of sale and deed of 1906, T. E. Palmer, the husband and agent of Ann Palmer, wrote the following letter to his daughter Mrs. Peck, at Minneapolis:

"Chariton, July 3, 1906.

"My dear Daughter: I have a favor to ask of you enclosed is a deed and a bill of sale, I hope we never will have to make use of them—but in case of your mother's death we have a deed of our home & a bill of sale of our goods made to you our lawyer tells us that it should be done to prevent our old creditors taking our property from us. While this protects my interest it also protects the interest of my children—C. H. leaves for New York to buy goods and while gone will visit New York & New England states and if he finds a place that suits him & suits me we will sell out here & go there, if that should happen we should expect you and Eva to come with us I also hope to have Grace and Riley live near us C. H. will be gone about a month he leaves on the 5th.

"This deed and bill of sale are only copies you will have to get forms and have a notary fill them out and acknowledge them and what it costs I will send to you will you please attend to this at once for then it will be off my mind it would be pleasant if you were here while C. H. is gone please return papers as soon as you can we all send love to you and Eva from your

"Affectionate father
"T. E. Palmer."

In this letter were a blank deed and a blank bill of sale. The circumstances indicate that the 1906 instruments which appellant used as his own are the Peck instruments referred to in this letter. It is contended by appellees that the instruments used by appellant, and the copies sent to Mrs. Peck by her father, were made by one Fancher, now deceased, instead of by appellant's attorney. Fancher was something of an attorney, but appears to have been somewhat illiterate. Reference is made to misspelled words in the different instruments, and the character of the paper and the typewriting in the copy of the bill of sale sent to Mrs. Peck and in the instruments used by appellant. Mrs. Peck, acting on her father's letter, made out a deed and bill of sale, and sent them as requested. Later, when she visited Chariton, appellant, C. H., told her not to worry about it; that her name was not in the papers; and that there was nothing to it. After that, she was at her father's house, and says she examined the 1906 deed and bill of sale, and that there was no name as grantee. Still later, and in 1910, Mrs. Peck was requested by her mother to make deed and bill of sale back to Mrs. Palmer, which she did. After the death of the father and mother, and after the fire, appellant, in attempting to get the insurance, produced a paper which the adjuster thought was defective. There was no name to it. Then appellant produced the 1911 bill of sale and deed, which satisfied the adjuster. As late as 1910, Ann Palmer stated that she wanted the property as long as she lived, and that appellant was to have one half, and one third of her half. This store was known as the A. Palmer store, and goods were shipped to her. The store was assessed to her. The insurance policies, during her life, were payable to her. The money of the concern was deposited as Ann Palmer's money, until she died. Appellant was asked two or three times for the Powell deed, which was not filed for record until August

18, 1916. He at first claimed that he didn't have it, and that it was mislaid; but when it was produced, his name appeared as grantee, and written in his own handwriting, although the rest of the deed was not so. Appellant testifies that he came into possession of the 1906 instruments, and brought them to the store and put them in the safe; that they were afterwards misplaced or lost; that he found them, after the fire, in one of the books in the safe in the store. There are some variations or contradictions in the testimony of appellant as a witness in the two trials.

There are many other circumstances in the record. Perhaps we should refer briefly to the 1911 instruments. As said, the testimony shows that they were executed to take the place of the first ones, and for the same purpose. There is the further claim, in regard to the last instruments, that they were obtained by fraud, coercion, undue influence, and compulsion, from the old lady, who was childish, weak, and infirm. It may be that the time is too remote for the claim that undue influence was used. Mrs. Ritchey testifies that, on April 24, 1911, when the second alleged bill of sale was executed by Ann Palmer and her husband, the notary, Mr. Stuart, and appellant came into the Palmer home, where witness was living; and she says further:

"Mr. Stuart and Charlie came in and spoke to them, and handed this paper. Charlie said, 'Mother, sign here.' And she looked up to him like she didn't know just what— I don't think she knew how—to me she appeared not to. Charlie Palmer came and closed the door between the rooms where I was and where they were. Soon after they left, I saw her again. She was worried, and had been crying. I heard her say, 'Thomas, Thomas, I don't feel right,' and he said, 'By God, that is the way you do every time.' He said this in a coarse and commanding way. Well, she got up and went to the living room, and said, 'God forgive me

for telling that lie.'   She was crying when she said that; she was using a cane, and was old and feeble at that time. She went into the closet off from the dining room.   She stayed there 15 or 20 minutes.   I thought she was praying and crying, from the sound.   It seemed as if I could hear her praying in there.   I could hear her talking in the closet, but I couldn't hear what she said.   She talked all the time she was in there until she came out.   I noticed her appearance when she came out of there, and her expression.   She had been crying.   I could tell that.   She was still crying.   Thomas Palmer didn't speak to her then.   I don't remember how old she was then.   I had been working there about a year and four months at that time, and I had been in daily contact with Ann Palmer.   She frequently cried.   She would cry easily.   From what I saw of her and her condition at the time and before Chas. Palmer and Mr. Stuart were there, and that I have told the court about, I do not think she was of sound mind, or so as to be able to deed away or convey $20,000 or $25,000 worth of property, or transact business for herself.   I do not think she was.   Charlie could get her to do most anything.   She thought so much of him.   I believe she was childish.   I always thought she was."

Other witnesses testify as to her mental incapacity, and the appellant put in testimony of medical men as to her mental soundness.

We have not attempted to go into the details of the evidence, but have stated, in a general way, the situation. Without further discussion or elaboration of the testimony, we reach the conclusion that the decree of the trial court was right, and it is, therefore,—*Affirmed.*

LADD, C. J., EVANS and SALINGER, JJ., concur.